Nadarjh RAMSAMEACHIRE,
Petitioner,

v.

John ASHCROFT, United States
Attorney General,
Respondent.

Docket No. 01–4071.

United States Court of Appeals,
Second Circuit.

Argued: March 17, 2003.

Decided: Feb. 3, 2004.

Visuvanathan Rudrakumaran, Law Office of Visuvanathan Rudrakumaran, New York, NY, for petitioner.

Megan L. Brackney, Assistant United States Attorney for the Southern District of New York (James B. Comey, United States Attorney for the Southern District of New York, on the brief; Kathy S. Marks and Gideon A. Schor, Assistant United States Attorneys, of counsel), New York, NY, for respondent.

Before: FEINBERG and SOTOMAYOR, Circuit Judges.*

SOTOMAYOR, Circuit Judge.

Petitioner Nadarjh Ramsameachire ("petitioner" or "Ramsameachire"), a citizen of Sri Lanka and a member of that nation's ethnic Tamil minority, appeals from the decision of the Board of Immigration Appeals ("BIA") denying his application for asylum and withholding of removal pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158 and 1231, respectively, and for withholding of removal pursuant to the Convention Against Torture ("CAT") and its implementing regulations, see 8 C.F.R. § 208.16. At his removal hearing, Ramsameachire testified as to his purported past persecution on the basis of his ethnicity and imputed political beliefs, as well as his fear of further persecution if returned to Sri Lanka. The Immigration Judge ("IJ") determined that Ramsameachire's testimony at the hearing differed substantially from his prior statements to an asylum officer during his airport interview, and based on these inconsistencies, found that Ramsameachire had no well-founded fear of persecution, and had not established that there was any danger that he would be persecuted or tortured if he was removed to Sri Lanka. The IJ concluded that Ramsameachire's lack of credibility therefore precluded relief under both the INA and CAT. The BIA affirmed the IJ's decision, including the credibility determination.

Ramsameachire now challenges the basis for the BIA's adverse credibility finding, arguing that his airport statement cannot provide the sole basis for discounting his hearing testimony. He also argues that even if the credibility determination

* The Honorable Fred I. Parker, who was a member of this panel, died following argument. Prior to his death, Judge Parker participated in the consideration and decision of this case. See 2d Cir. R. § 0.14(b).

was correct, the BIA and IJ should not have relied upon it in rejecting his alternative basis for fearing persecution, that Tamils as a group are subject to a pattern or practice of persecution. Finally, he challenges the rejection of his CAT claim, asserting that the BIA and IJ were required to consider his proffered evidence of the conditions in Sri Lanka before concluding that he was not entitled to withholding of removal pursuant to CAT.

We hold that (1) although airport statements can, in some circumstances, be unreliable, the BIA was entitled to consider Ramsameachire's airport interview statements in making its credibility determination, because the airport interview was carefully conducted with the assistance of a Tamil interpreter and because it is clear that Ramsameachire understood the nature of the proceedings; (2) the BIA's determination that Ramsameachire's testimony was not credible, and its consequent conclusion that he had not established his eligibility for asylum, are supported by substantial evidence; (3) the BIA's finding that Ramsameachire was not credible also precluded holding that he was entitled to asylum based on a pattern or practice of persecution; (4) the BIA's determination that Ramsameachire failed to establish his entitlement to withholding of removal pursuant to 8 U.S.C. § 1231(b)(3)(A) is supported by substantial evidence; and (5) the BIA's failure to consider Ramsameachire's evidence of country conditions before rejecting his CAT claim violated CAT's implementing regulations. We therefore affirm the BIA's rejection of Ramsameachire's claims for asylum and withholding of removal under the INA, and vacate and remand its decision on his CAT claim.

1. The INS has since been reconstituted as the Bureau of Immigration and Customs Enforcement, a part of the Department of Homeland

## BACKGROUND

Ramsameachire is a native and citizen of Sri Lanka, and a member of its ethnic Tamil minority, which comprises roughly eighteen percent of Sri Lanka's population. For over fifteen years, Sri Lanka's Tamils have been engaged in a civil war with the majority Sinhalese population, which controls the government. *See Balasubramanrim v. INS*, 143 F.3d 157, 159–60 (3d Cir.1998). The fighting is primarily conducted by the Liberation Tigers of Tamil Eelam (LTTE). Ramsameachire alleges that, although he has never been a member or supporter of LTTE, the government suspected him of being affiliated with the group simply because he was an adult Tamil male. He claims that he was repeatedly harassed and arrested as a result.

Ramsameachire arrived in the United States via Haiti on July 28, 2000, having departed Sri Lanka a few weeks before. He attempted to enter the United States with a fraudulent Canadian passport, rendering him inadmissible under 8 U.S.C. § 1182(a)(6) and (7), which provide that aliens in possession of fraudulent documentation may not be admitted into the United States. Ramsameachire claimed asylum, however, and was referred to an Immigration and Naturalization Service ("INS")[1] officer for an interview, to be conducted at the airport where he was being detained. Because the INS had already determined that Ramsameachire was inadmissible, the purpose of the interview was to determine whether further review of his asylum claim was warranted, or whether he should be immediately removed. *See* 8 U.S.C. § 1225(b)(1)(ii).

During the interview, Ramsameachire was given the assistance of a Tamil interpreter. He indicated that he understood

Security. Because the rulings at issue were issued when the agency was still the INS, we refer to it as the INS in this opinion.

the officer's questions as communicated by the interpreter, and that he understood that the nature of the proceeding was to determine whether he should be admitted into the United States despite his inadmissibility. The INS officer informed Ramsameachire that "[i]f you fear ... being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially about your fear and concern." After indicating that he was comfortable speaking to the officer in a private room, Ramsameachire stated that he was on his way to Canada to find a job, and that he had relatives there. He claimed that he would be arrested if returned to Sri Lanka, because he "went abroad illegally without permission," and that he "could have been harmed anytime" because "[t]here is a war going on." When asked whether he had ever been arrested, he answered that he was arrested several times "for suspicion and immediately released" when he displayed his national identity card, but that he did not remember the dates of the arrests.

Ramsameachire was then referred for a "credible fear" interview, at which he gave a more detailed account of his experiences with the Sri Lankan authorities. He stated that he had lived in Colombo since birth, and that he left Sri Lanka because he was afraid that he would be arrested because he was a Tamil. He alleged that he had been arrested three times before, and that he was held for a period of days each time. According to Ramsameachire, the first arrest occurred on May 25, 1997, and was precipitated by suspicion that Ramsameachire was melting gold to assist the LTTE movement. During that arrest, Ramsameachire was allegedly beaten and held for twenty-two days. The second arrest occurred on July 16, 1999, again because of suspected assistance to the LTTE. The third arrest took place on December 20, 1999, at which point Ramsa-

meachire was told that if he were arrested again, he would die in jail.

Ramsameachire filed a formal application for asylum on September 1, 2000, asserting that he had suffered past persecution because of his status as a Tamil and the political beliefs imputed to him because of his ethnicity, and that he feared that he would suffer future persecution on the same basis. He also sought CAT relief on the ground that he would be tortured if he returned to Sri Lanka. Ramsameachire subsequently testified in a removal hearing before the IJ in September 2000, repeating many of the statements he made at his credible fear interview. Ramsameachire asserted that he had lived in Colombo for most of his life, but had spent substantial periods living in other cities in Sri Lanka. He repeated his account of the three arrests and beatings, although his account of the reasons for those arrests varied from his statements at the credible fear interview. At the removal hearing, he initially testified that his first arrest occurred because he had been forced to give the LTTE money, but later stated that he was arrested because he was suspected of melting gold for the LTTE. He indicated that he was released from custody following each arrest only after his employer or a member of his family paid a bribe to the authorities. Finally, Ramsameachire explained the inconsistencies between his testimony and his statements at the airport interview by asserting that he had been nervous at the interview, and had thought that if he told the truth about his arrests, the INS officer would think he was a criminal and refuse to allow him into the country.

The IJ denied Ramsameachire's request for asylum, finding that he had failed to establish that he had suffered past persecution or that he had a credible fear of future persecution. The IJ's decision was based entirely on his finding that Ramsa-

meachire's hearing testimony was not credible because of its inconsistency with his airport interview. Specifically, the IJ noted that Ramsameachire's stated reasons for his fear of returning to Sri Lanka had changed: in his airport interview, he stated that he would be punished for leaving the country, while in his asylum application, he claimed that he would be persecuted because he was a Tamil. His account of the arrests, the reasons for the arrests, and their duration was also markedly different in the two proceedings. Furthermore, there were additional inconsistencies as to collateral matters, such as where he had lived and whether his family knew about his arrests. Because Ramsameachire had failed to establish his entitlement to asylum, the IJ concluded that Ramsameachire had necessarily failed to show that he was entitled to withholding of removal pursuant to the INA, which requires a higher degree of proof than an asylum claim. Finally, the IJ concluded that because there was "no testimony here that [Ramsameachire] would be tortured by the Sri Lankan government upon his return," he was not entitled to withholding of removal pursuant to CAT.

Ramsameachire appealed to the BIA, which affirmed the IJ's decision on April 25, 2001. The BIA upheld the IJ's credibility determination, also emphasizing the variance between Ramsameachire's airport interview statements and his hearing testimony, particularly with respect to his reasons for fearing harm and the treatment he received when he was arrested. Although the agency noted that airport interviews are of limited value and that the agency should be "cautious" in relying on inconsistencies between the airport interview and later statements, it concluded that the inconsistencies in Ramsameachire's accounts were so fundamental that they were entitled to "considerable weight." In light of these inconsistencies, the BIA determined that "[i]t follows that

the respondent has failed to satisfy his burden of persuasion," and "[g]iven our finding in this regard, we need not address the respondent's arguments on appeal relating to the country conditions in Sri Lanka." With respect to Ramsameachire's CAT claim, the BIA simply stated that he "has failed to establish that he would be subject to torture by any public official in Sri Lanka, . . . and thus has failed to articulate a claim under the [CAT]." This appeal followed.

## DISCUSSION

On appeal, petitioner raises a number of challenges to the determinations of the BIA. First, Ramsameachire argues that the agency should not have relied solely on his airport statement in concluding that inconsistencies in his statements rendered him not credible, and that the denial of asylum was therefore not supported by substantial evidence. Second, Ramsameachire claims that the INS incorrectly relied on its adverse credibility determination, to the exclusion of his proffered evidence of country conditions, in rejecting his claim that he was entitled to asylum based on a pattern or practice of persecution of Tamils. Third, he argues that the INS should not have relied solely on its adverse credibility determination in denying him relief under CAT, and that it should have considered his proffered objective evidence that both Tamils and returned asylum seekers are persecuted in Sri Lanka.

### I. Standards of Review

We review the factual findings underlying the BIA's determinations under the substantial evidence standard, reversing only if "no reasonable fact-finder could have failed to find" that petitioner suffered past persecution or had a well-founded fear of future persecution or torture. *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir. 2000); *Melgar de Torres v. Reno*, 191 F.3d 307, 313 (2d Cir.1999). Although credibili-

ty determinations are entitled to the same deference on review as other factual determinations, the fact that the BIA has relied primarily on credibility grounds in dismissing an asylum application cannot insulate the decision from review. *See Secaida–Rosales v. INS,* 331 F.3d 297, 307 (2d Cir.2003). The BIA must give "specific, cogent" reasons for rejecting the petitioner's testimony, and we will reverse where the adverse credibility determination is based upon speculation or upon an incorrect analysis of the testimony. *Id.* (quoting *Aguilera–Cota v. INS,* 914 F.2d 1375, 1381 (9th Cir.1990)). With respect to questions of law, the agency's interpretation of the statutes it administers or its own regulations is entitled to "substantial deference." *See Chevron USA v. Natural Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Diallo,* 232 F.3d at 285. In contrast, we review the agency's application of legal principles to undisputed facts *de novo. Diallo,* 232 F.3d at 287.

## II. Ramsameachire's Request for Asylum and Withholding of Removal Pursuant to the INA

 An alien seeking asylum in the United States must first establish that he is a "refugee" because he is "unable or unwilling" to return to his native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). An applicant may qualify for refugee status in two ways. First, he may demonstrate that he has suffered past persecution, in which case a presumption arises that he has a well-founded fear of future persecution. *Melgar de Torres,* 191 F.3d at 311. Second, the applicant may establish that he has a well-founded fear of future persecution, which requires that the alien present credible testimony that he subjectively fears

persecution and establish that his fear is objectively reasonable. *Abankwah v. INS,* 185 F.3d 18, 22 (2d Cir.1999). Thus, proving well-founded fear requires that the applicant establish both a subjective and an objective element. "The former is established via the applicant's credible testimony that his fear is genuine; while the latter is largely dependent upon the context and believability he can establish for his claims through presentation of reliable, specific, objective supporting evidence." *Cordero–Trejo v. INS,* 40 F.3d 482, 491 (1st Cir.1994). Once the applicant establishes that he is a refugee, the Attorney General has discretion to decide whether to grant him asylum. 8 U.S.C. § 1158(b)(1).

 Claims for withholding of removal under the INA are closely related to asylum, but the Attorney General must grant withholding of removal to aliens who have established the necessary elements. Accordingly, an application for withholding of removal requires a higher standard of proof. If the alien establishes that it is more likely than not that his "life or freedom would be threatened in [the] country because of [his] race, religion, nationality, membership in a particular social group, or political opinion," the Attorney General must grant withholding of removal. 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)(1). Because the withholding of removal analysis overlaps factually with the asylum analysis, but involves a higher burden of proof, an alien who fails to establish his entitlement to asylum necessarily fails to establish his entitlement to withholding of removal. *Zhang v. Slattery,* 55 F.3d 732, 738 (2d Cir.1995).

## A. The BIA's Credibility Determination and Rejection of Ramsameachire's Asylum Claim

The BIA found that the inconsistencies in Ramsameachire's statements rendered

him incredible, and denied his asylum and withholding of removal claims solely on the basis of the inconsistencies. Although the BIA did not parse the two means of establishing refugee status, its adverse credibility determination necessarily precluded finding that Ramsameachire had demonstrated that he had suffered persecution in the past, and that Ramsameachire subjectively feared that he would be harmed in the future. Thus, the BIA's conclusion as to Ramsameachire's credibility was determinative of both his asylum and withholding of removal claims. Ramsameachire argues that the INS incorrectly concluded that he was incredible solely on the basis of inconsistencies between his testimony at the removal proceeding and his airport statement. In challenging the BIA's determination, Ramsameachire relies on *Balasubramanrim v. INS*, 143 F.3d 157, 162 (3d Cir.1998), and *Senathirajah v. INS*, 157 F.3d 210 (3d Cir.1998), both of which he incorrectly characterizes as precluding exclusive reliance on airport statements in making adverse credibility determinations.

Contrary to Ramsameachire's argument, *Balasubramanrim* and *Senathirajah* hold only that the BIA may not rely on an alien's airport interview where "an examination of the record reveals that [the alien's] airport interview may not represent an accurate account of the persecution suffered" by the alien in his home country. *Balasubramanrim*, 143 F.3d at 162; *see also Senathirajah*, 157 F.3d at 217–18. The airport interview is intended to provide the alien an opportunity to express his or her concerns about removal to his or her home country, a task that requires the alien simply to describe the facts or experiences upon which his or her fear is based, and the interview will usually provide a reliable record of the alien's basis for seeking asylum. Thus, the INS may rely on airport statements in judging an asylum applicant's credibility if the record of the interview indicates that it presents an accurate record of the alien's statements, and that it was not conducted under coercive or misleading circumstances. *See Balasubramanrim*, 143 F.3d at 164 (holding that the interview "in this case" was not sufficiently reliable to support finding that alien was not credible); *cf. Chen v. INS*, 344 F.3d 272, 274 (2d Cir. 2003) (per curiam) (assuming that BIA properly relied on alien's airport interview statements).

■■■■ *Balasubramanrim* and *Senathirajah* thus stand for the proposition, with which we concur, that the BIA and reviewing courts must closely examine each airport interview before concluding that it represents a sufficiently accurate record of the alien's statements to merit consideration in determining whether the alien is credible. *See Senathirajah*, 157 F.3d at 218. The airport interview is an inherently limited forum for the alien to express the fear that will provide the basis for his or her asylum claim, and the BIA must be cognizant of the interview's limitations when using its substance against an asylum applicant. *Id.* The interview takes place immediately after an alien has arrived in the United States, often after weeks of travel, and may be perceived by the alien as coercive or threatening, depending on the alien's past experiences. Moreover, at the interview, the alien is not represented by counsel, and may be completely unfamiliar with United States immigration laws and the elements necessary to demonstrate eligibility for asylum. Finally, because those most in need of asylum may be the most wary of governmental authorities, the BIA and reviewing court must recognize, in evaluating the statements made in an interview, that an alien may not be entirely forthcoming in the initial interview.

■■■■■ With these limitations in mind, the Third Circuit in *Balasubramanrim*

and *Senathirajah* delineated several factors that the BIA should use to evaluate the reliability of both the record of the airport interview as a source of the alien's statements, and the statements themselves. We now adopt these factors. First, a record of the interview that merely summarizes or paraphrases the alien's statements is inherently less reliable than a verbatim account or transcript. *Balasubramanrim*, 143 F.3d at 162–63; *see also Senathirajah*, 157 F.3d at 218–20. Second, similarly less reliable are interviews in which the questions asked are not designed "to elicit the details of an asylum claim," or the INS officer fails to ask follow-up questions that would aid the alien in developing his or her account. *Balasubramanrim*, 143 F.3d at 162–63. Third, an interview may be deemed less reliable if the alien appears to have been reluctant to reveal information to INS officials because of prior interrogation sessions or other coercive experiences in his or her home country. *Id.* at 163. Finally, if the alien's answers to the questions posed suggest that the alien did not understand English or the translations provided by the interpreter, the alien's statements should be considered less reliable. *Id.* Examining the interview in light of these factors will focus the agency's inquiry on whether the record of the interview accurately reflects the alien's statements, whether the alien had a full opportunity to express him- or herself, and whether the alien's statements are likely to reflect his or her actual beliefs and fears. These aspects of the interview must be deemed reliable before the BIA uses the interview to assess the alien's credibility.

Although the factors described above are not exhaustive, they provide the analytical framework for assessing the reliability of an airport interview. In all cases, the BIA and reviewing court should use the airport interview in judging the alien's credibility only after examining the record of the airport proceeding as a whole, in light of the alien's particular circumstances and language ability, and concluding that it represents a reliable source of the alien's statements and actual beliefs. If, after reviewing the record of the interview in light of these factors and any other relevant considerations suggested by the circumstances of the interview, the BIA concludes that the record of the interview and the alien's statements are reliable, then the agency may, in appropriate circumstances, use those statements as a basis for finding the alien's testimony incredible. Conversely, if it appears that either the record of the interview or the alien's statements may not be reliable, then the BIA should not rely solely on the interview in making an adverse credibility determination.

Once the BIA has concluded that the airport interview is sufficiently reliable to be considered part of the record, the *weight accorded to any inconsistencies* between the alien's interview statements and his or her subsequent assertions will depend on the nature of the variances, considered in light of the relatively superficial nature of the airport interview. It may often be the case that an alien's answers during the airport interview provide a less detailed account of the alien's experiences than his or her subsequent asylum application and testimony. Moreover, minor factual discrepancies between the airport statement and the alien's application and hearing testimony may simply reflect the fact that the alien has had the chance to parse his or her experience more carefully or refresh his or her recollection after the initial interview. Immaterial inconsistencies need not be construed as an attempt to massage the alien's statements into a more viable claim. Where the alien's airport statements and his or her later testimony present materially different accounts of his or

her purported persecution, however, the inconsistencies may render the alien's testimony incredible. Thus, the manner in which the interview was conducted and the alien's circumstances and demeanor will determine whether the interview should be taken into account in assessing the alien's credibility, and the nature of the inconsistencies themselves will decide whether the alien's airport statements render his or her subsequent testimony incredible.

 Here, the BIA properly considered the dangers inherent in airport interviews and reasonably concluded that Ramsameachire's interview was conducted in such a manner as to ensure that it provides a reliable source of his statements. The agency noted that, given "the limitations inherent to the airport interview process, which are largely caused by a lack of time and resources," it must always "be cautious when contrasting an alien's airport statement to his written asylum application and oral testimony," but found that Ramsameachire's interview was reliable enough to use as a source of his prior statements about his asylum claim. This conclusion is supported by substantial evidence.

Ramsameachire's airport interview was conducted in a non-coercive and careful manner. At the beginning of the interview, the INS officer explained to Ramsameachire that "U.S. law provides protection to certain persons who face persecution ... upon return to their home country. If you fear ... being removed from the United States or ... being sent home, you should tell me so during this interview because you may not have another chance." The interview did not proceed until Ramsameachire indicated that he understood the officer's statement and his rights under United States law. Moreover, Ramsameachire was provided with a Tamil interpreter, and was specifically asked if he could understand him or her, alleviating any concern that he was not able to understand the proceedings, or make himself understood. *Cf. Senathirajah,* 157 F.3d at 218 (noting that alien had asked for an interpreter and none was provided). Ramsameachire was asked questions that were clearly designed to elicit a potential basis for an asylum claim, such as whether he would be harmed on his return and why, whether he had ever been arrested and why, and whether he had been harmed by authorities in his home country. When Ramsameachire stated that he feared returning to Sri Lanka because he might be punished for seeking asylum in the United States, the INS officer asked follow-up questions. Thus, unlike the interview at issue in *Balasubramanrim,* 143 F.3d at 162, Ramsameachire's interview provided him with ample opportunity to explain his fear of returning to Sri Lanka, and any harm that he had suffered there in the past. Moreover, the record of his statement bears hallmarks of accuracy and reliability, as it is typewritten, signed by Ramsameachire, and initialed by him on each page.[2] The record also indicates that he was given the opportunity to make corrections to the transcription. Finally, although Ramsameachire attempts to reconcile the differences between his airport statements and his later testimony by asserting that he was nervous about speaking to INS officials at the airport, the fact that he stated at the interview that he was

---

**2.** Because the record of the interview is written in English, the interpreter presumably assisted Ramsameachire in reviewing it.

comfortable speaking in a private room and that he understood the purpose of the interview undermines any claim that the interview was unduly coercive or that Ramsameachire felt that he had no opportunity to explain his situation to the officer. The BIA was therefore entitled to rely on the airport interview as a source of Ramsameachire's statements.

■■■■ The agency's consequent rejection of Ramsameachire's asylum claim based on the inconsistencies between his airport interview and his later statements is also supported by substantial evidence. As the BIA noted, the inconsistencies in Ramsameachire's statements went to the heart of his asylum claim. Although at the airport interview he indicated that he feared persecution if returned to Sri Lanka because of his status as a returned asylum seeker, in his asylum application, hearing testimony, and legal arguments, he focused solely on his fear of ethnic persecution. If he had indeed been arrested because he was a Tamil, he could have

asserted as much in response to the airport interviewer's questions about his fear of harm. Moreover, Ramsameachire stated during the airport interview that he had been briefly arrested and immediately released, but his later testimony included detailed, specific accounts of arrests, extended confinement, beatings, threats, and bribery. Ramsameachire's statements also contained a number of more minor inconsistencies, including where he lived and whether he could remember the dates of his arrests. As the BIA reasoned, "[i]nstead of merely being an incomplete version of the same events, [Ramsameachire's] airport statement paints a very different picture than his testimony and written asylum application." [3] The BIA was therefore justified in finding Ramsameachire's account of his treatment at the hands of the Sri Lankan authorities incredible, and the BIA's consequent conclusion that Ramsameachire had not suffered past persecution, and had no genuine subjective fear of future persecution, was supported by substantial evidence.[4]

3. The BIA rested this conclusion in part on the fact that Ramsameachire told the airport interviewer that he was traveling to Canada to start a business, an assertion that the BIA apparently found inherently inconsistent with his decision to apply for asylum in the United States. We find this point unpersuasive. Fleeing Sri Lanka to escape persecution, and intending to start a business in Canada, are clearly not mutually exclusive purposes. Having just arrived in the United States and not yet being represented by counsel, Ramsameachire cannot be expected to have understood the INS officer's question, "What is your purpose in going to Canada?" as directed solely towards his intent to seek asylum. Indeed, Ramsameachire's answer to the question—"To start a business there. I'll find out when I get there. I'll find a job."—indicates that he understood it as directed toward what he would do once he arrived in Canada, rather than why he had left Sri Lanka in the first place. Although we are reluctant to consider this an inconsistency in Ramsameachire's statements, the other inconsistencies on

which the BIA relied are sufficient to support its judgment.

4. Ramsameachire argues for the first time in his petition for review that he was eligible for asylum on the independent ground that he feared persecution based on his status as a returned asylum seeker, asserting that the Sri Lankan government arrests and tortures people who return after having left Sri Lanka illegally. Although Ramsameachire did argue below that he was entitled to CAT relief because returning Tamil asylum seekers are subject to torture, he did not argue to the IJ or BIA that his status as a returned asylum seeker, without more, established his status as a "refugee" under the INA. Indeed, both his asylum application and his closing arguments at his asylum hearing focused exclusively on his claims based on his status as a Tamil. Establishing his entitlement to asylum based on his status as a returned illegal emigrant would require Ramsameachire to show that those who flee illegally and return constitute a "particular social group" qualifying for ref-

## B. Asylum Based on a Pattern or Practice of Persecution

 Ramsameachire also challenges the BIA's conclusion that because it found Ramsameachire's testimony incredible, it need not consider his claim for asylum based upon a pattern or practice of persecution against Tamils. The INS's regulations provide that, in establishing the objective component of a well-founded fear of persecution, an applicant need not establish a reasonable possibility that he will be singled out for persecution if he can demonstrate that "there is a pattern or practice ... of persecution of a group of persons similarly situated to the applicant," and the applicant is a member of the group, "such that his or her fear of persecution upon return is reasonable." 8 C.F.R. § 208.13(b)(2)(iii)(B); *see also Osorio v. INS*, 18 F.3d 1017, 1031 (2d Cir. 1994) (stating that petitioner could establish the reasonableness of his fear of persecution by proving a pattern or practice of persecution); *Kotasz v. INS*, 31 F.3d 847, 852 (9th Cir.1994) (discussing the pattern or practice method of proving the reasonableness of one's fear of persecution).

Ramsameachire's argument overlooks the fact that, in order to establish his eligbility for asylum, he had to demonstrate both that he subjectively feared future persecution, and that his fear was objectively reasonable. 8 C.F.R. § 208.13(b)(2)(i). Although his pattern or practice evidence was relevant to the objective reasonableness of his fear of persecution, the BIA's adverse credibility determination precluded him from establishing the subjective prong of the well-founded fear standard. The BIA was therefore justified in not considering Ramsameachire's proffered evidence of widespread persecution of Tamils before rejecting his asylum application.

## C. Withholding of Removal Pursuant to the INA

Ramsameachire also sought withholding of removal pursuant to the INA, *see* 8 U.S.C. § 1231(b)(3)(A), asserting that it was more likely than not that his "life or freedom" would be threatened upon his return to Sri Lanka because of his status as a Tamil. Although it is unclear whether Ramsameachire challenges the BIA's rejection of this claim in his petition for review, we will address it for purposes of completeness. Because "an applicant who cannot establish his eligibility for asylum is necessarily unable to establish his eligibility for withholding of removal," *Chen*, 344 F.3d at 275, and the BIA properly determined that Ramsameachire was not entitled to asylum because of his inability to demonstrate a well-founded fear of persecution, it correctly denied his application for withholding of removal as well, *see id.* at 276.

ugee status. *See* 8 U.S.C. § 1101(a)(42)(A). Ramsameachire's request for CAT relief based on this status therefore cannot be construed as an assertion that he would be entitled to asylum on this basis as well. Ramsameachire presented no evidence to the IJ or BIA that the group of returned asylum seekers possesses some fundamental characteristic, both "recognizable and discrete," that would be evident to outside authorities, as is required to establish persecution based on membership in a social group, *see Gomez v. INS*, 947 F.2d 660, 664 (2d Cir.1991), nor did he ever make a specific legal argument that he was entitled to asylum on this ground. The agency therefore had no opportunity to consider this question in the first instance. We find that petitioner waived this argument, *see* 8 U.S.C. § 1252(d); *Drozd v. INS*, 155 F.3d 81, 91 (2d Cir.1998), and express no opinion on whether the group of "returned asylum seekers" or those who have fled Sri Lanka illegally constitutes a discrete social group within the meaning of 8 C.F.R. § 208.13(b)(2)(A).

### III. Withholding of Removal Pursuant to the Convention Against Torture

Finally, Ramsameachire asserts that the BIA improperly denied him withholding of removal pursuant to CAT solely on the basis of its adverse credibility determination. We agree. Ramsameachire proffered evidence of the Sri Lankan government's practice of torturing both Tamils and returned Tamil asylum seekers to the IJ and BIA. Because the INS's regulations require it to consider all relevant evidence of the possibility of torture, and the CAT and asylum analyses focus on different elements and therefore must be treated independently, we hold that the INS may not deny an alien's CAT claim solely on the basis of its determination that the applicant's testimony is not credible.

■ Article 3 of CAT provides that "no State Party shall expel [or] return ... a person to another State in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted* Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85. Torture is defined as the intentional infliction of pain or suffering that is perpetrated or sanctioned by a nation's authorities. *See Wang v. Ashcroft,* 320 F.3d 130, 134 (2d Cir.2003). CAT was ratified by the Senate in 1990, and was subsequently enacted in the note to 8 U.S.C. § 1231 and implemented by 8 C.F.R. § 208.16. *Id.* at 133. The regulations provide that once an alien establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal," the United States may not remove him or her to that country. 8 C.F.R. § 208.16(c)(2). The regulations also state that:

In assessing whether it is more likely than not that an applicant would be tor-

tured in the proposed country of removal, *all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:*

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

*Id.* § 208.16(c)(3) (emphasis added).

■ The regulations require the BIA to consider *all* evidence of possible torture proffered by the alien, regardless of the weight it accords the alien's testimony. The BIA's assumption that, given its credibility finding, it "need not address [Ramsameachire's] arguments on appeal relating to the country conditions in Sri Lanka" before concluding that he "has failed to establish that he would be subject to torture by any public official in Sri Lanka" therefore violated the agency's own regulations by placing determinative weight on the adverse credibility determination. Although the INS's interpretations of its own regulations are normally entitled to deference, *see Diallo,* 232 F.3d at 285, here the BIA failed to consider the evidence that it was plainly required to examine under § 208.16(c)(3).

■ More fundamentally, both the IJ and BIA incorrectly assumed that Ramsameachire's CAT claim was necessarily precluded because he had failed to carry his burden of proof with respect to his asylum claim. Because the CAT inquiry is independent of the asylum analysis, however, the BIA's decision with respect to an

alien's claims for asylum and withholding of removal pursuant to the INA should never, in itself, be determinative of the alien's CAT claim. *See Kamalthas v. INS,* 251 F.3d 1279, 1283 (9th Cir.2001) (noting that "a claim under the Convention is not merely a subset of claims for either asylum or withholding of removal"). A CAT claim focuses solely on the likelihood that the alien will be tortured if returned to his or her home country, regardless of the alien's subjective fears of persecution or his or her past experiences. Unlike an asylum claim, the CAT claim lacks a subjective element, focuses broadly on torture without regard for the reasons for that treatment, and requires a showing with respect to future, rather than past, treatment. *See* 8 C.F.R. § 208.16(c)(3), (4); *Wang,* 320 F.3d at 144 & n. 20 (discussing the showing necessary to establish entitlement to CAT relief). Consequently, an alien's CAT claim may be established using different evidence and theories than the alien's INA claims. The CAT claim therefore must always be considered independently of the resolution of the alien's claims under the INA. The INS's CAT regulations reflect the independence of the INA and CAT as avenues of relief from removal, as well as CAT's objective focus, by requiring the agency to consider "all evidence relevant to the possibility of future torture," including evidence of current country conditions, without requiring any specific type of showing. *See* 8 C.F.R. § 208.16(c)(3).

In particular, an adverse credibility determination made in the asylum context should not necessarily affect the BIA's consideration of the alien's CAT claim. While an asylum claim depends on an alien's credibility, because the alien must establish, through credible testimony, either that he or she has suffered past persecution, or that he or she subjectively fears future persecution, to prevail on a CAT claim the alien need only proffer objective evidence that he or she is likely to be tortured in the future. An adverse credibility determination, therefore, will doom an alien's asylum claim, but may not be a particularly significant aspect of the CAT inquiry. *See Zubeda v. Ashcroft,* 333 F.3d 463, 476 (3d Cir.2003) (stating that the "taint of the earlier adverse credibility determination" in the asylum context should not be allowed to "bleed through" to the BIA's consideration of the CAT claim).

Ramsameachire's proffered evidence and the bases for his CAT claim illustrate both the need to give independent treatment to asylum and CAT claims, and the lesser relevance of credibility in the CAT context. Ramsameachire's CAT claim is founded on his assertions that he will be tortured upon his return to Sri Lanka because of his ethnicity and because he fled the country in an attempt to seek asylum. In contrast, his asylum claim is based solely on his status as a Tamil. Although the inconsistencies in Ramsameachire's testimony may be relevant to the probability that he will be tortured because of his ethnicity, his lack of credibility as to past persecution should not preclude him from establishing, through evidence of *current* conditions in Sri Lanka, that he is likely to be tortured upon his return. Moreover, Ramsameachire's testimony regarding his persecution based on his ethnicity is irrelevant to the possibility that he will be tortured for having attempted to seek asylum in the United States.

The BIA therefore should not have treated its rejection of Ramsameachire's claims for relief under the INA as determinative of his CAT claim, and should have considered all of Ramsameachire's proffered evidence before rejecting his claim. *See Zubeda,* 333 F.3d at 476; *Kamalthas,* 251 F.3d at 1283–84; *Mansour v.*

*INS,* 230 F.3d 902, 908 (7th Cir.2000). Because asylum and CAT claims "warrant[ ] individualized treatment," *Mansour,* 230 F.3d at 909, and because the INS's regulations require the agency to consider all evidence relevant to the CAT claim, we vacate the BIA's dismissal of Ramsameachire's CAT claim and remand for further proceedings.

## CONCLUSION

For the foregoing reasons, the BIA's judgment with respect to Ramsameachire's claims for asylum and withholding of deportation pursuant to the INA are AFFIRMED. The BIA's dismissal of Ramsameachire's CAT claim is VACATED and REMANDED for further proceedings consistent with this opinion.