*Pomavilla-Zaruma v. Garland*

# United States Court of Appeals
# For the Second Circuit

August Term 2022

Argued: June 9, 2023
Decided: August 30, 2023

No. 20-3230

ROSA ELVIRA POMAVILLA-ZARUMA,

*Petitioner,*

*v.*

MERRICK B. GARLAND, UNITED STATES ATTORNEY GENERAL,

*Respondent.*

Appeal from the Board of Immigration Appeals,
*In re Pomavilla-Zaruma*, No. A 206 506 589 (B.I.A. Aug. 24, 2020).

Before:     PÉREZ, NATHAN, and MERRIAM, *Circuit Judges*.

Petitioner applied for asylum, withholding of removal, and protection under the Convention Against Torture. An immigration judge found Petitioner not credible and denied her application, relying in part on inconsistencies between Petitioner's statements during a border interview and later testimony regarding her fear of persecution. However, the immigration judge failed to consider various factors that may have affected the reliability of the border interview record. Petitioner claims that she was frightened during the interview because a border patrol officer hit her and yelled at her upon her arrival to the United States. Petitioner may also have been reluctant to reveal information about persecution because authorities in her home country were allegedly unwilling to help her due to her indigenous status. Moreover, the questions asked during Petitioner's border interview generally were not designed to elicit the details of an asylum claim. In *Ramsameachire v. Ashcroft*, 357 F.3d 169 (2d Cir. 2004), we cautioned immigration judges to consider these factors and others before relying on a border interview to find an asylum applicant not credible. Consistent with *Ramsameachire* and subsequent precedent, we hold that immigration judges are required to take such precautions, provided the record indicates that the *Ramsameachire* factors may be implicated. Accordingly, we **GRANT** the petition for review in part, **VACATE** the BIA's decision, and **REMAND** the case for further proceedings consistent with this opinion.

––––––––

REUBEN S. KERBEN, ESQ., Kerben Law Firm, P.C., Kew Gardens, NY, *for Petitioner*.

LIZA S. MURCIA (Brian M. Boynton, Acting Assistant Attorney General, Anthony C. Payne, Assistant Director, *on the brief*), Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, DC, *for Respondent*.

––––––––

2

NATHAN, *Circuit Judge*:

For almost two decades, this Court has recognized inherent limitations in asylum applicants' willingness and ability to express their fear of persecution during border interviews. Persons fleeing state-sponsored abuse in their home countries may travel weeks to seek asylum in the United States, arriving travel-worn, apprehensive of governmental authorities, and lacking English fluency, access to legal counsel, or knowledge of our immigration laws. It is therefore unsurprising that some asylum seekers feel intimidated, reluctant, or confused during the interviews with border patrol officers that occur immediately after their arrival. Moreover, because a border interview is not an interview for asylum, the interviewing officers might not pose questions aimed at developing the details of an asylum claim or record a verbatim transcript of the interviewee's responses. *See Ramsameachire v. Ashcroft*, 357 F.3d 169, 179–80 (2d Cir. 2004) (citing *Balasubramanrim v. I.N.S.*, 143 F.3d 157, 162–63 (3d Cir. 1998), and *Senathirajah v. I.N.S.*, 157 F.3d 210, 218–20 (3d Cir. 1998)).

In *Ramsameachire v. Ashcroft*, we cautioned immigration judges to keep these considerations in mind before relying on statements an asylum applicant made

during a border interview in assessing the applicant's credibility. Applying that precedent, we hold that an immigration judge may not rely on a border interview to find an asylum applicant not credible without first considering the *Ramsameachire* factors, if the record indicates that those factors may be relevant. Because the immigration judge reviewing Petitioner Rosa Elvira Pomavilla-Zaruma's asylum application did not take such precautions, we grant her petition for review.

## BACKGROUND

Rosa Elvira Pomavilla-Zaruma fled her home country of Ecuador in 2013, when she was nineteen years old. After spending a month travelling north, she rafted across the Rio Grande and entered Texas, where she was apprehended by U.S. border patrol without valid entry documents. Pomavilla-Zaruma later described the encounter with border patrol as "frighten[ing]." Certified Administrative Record (CAR) 145. When she and four other individuals reached the riverbank, they began running, but stopped when a border patrol agent yelled at them. By her account, "[a]fter he caught us, he started hitting us on the back with . . . something they carry on their belts." CAR 145.

4

The following day, on May 5, 2013, border patrol agents interviewed Pomavilla-Zaruma. The record of that interview is not in the form of a transcript, although it includes questions and answers that appear to record the conversation verbatim. When asked the "purpose for [her] entry into the United States," she answered "[t]o reside and seek employment and continue my education." CAR 135. When asked whether she feared persecution or torture if she was sent back to Ecuador, Pomavilla-Zaruma answered "[n]o." CAR 136. She was placed in removal proceedings, conceded removability, and timely applied for asylum, withholding of removal, and relief under the Convention Against Torture.

The following year, in 2014, Pomavilla-Zaruma completed a credible fear interview—that is, a screening interview conducted by an asylum officer to determine whether Pomavilla-Zaruma's asylum application would receive "full consideration" by an immigration judge (IJ). *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 (2020) (quoting 8 C.F.R. § 208.30(f)). During the interview, she alleged that a man in her home country, whom she identified by name, began pursuing her and trying to inappropriately touch her when she was a child, and that he began raping her when she was a teenager. Until Pomavilla-

Zaruma left Ecuador, the man continued to rape, harass, and physically assault her. He threatened her not to tell anyone, and when her mother found out, he also threatened and harassed her mother. Pomavilla-Zaruma claimed that the police would not protect her because she was indigenous, and although she reported the man to authorities and he was convicted of rape, the sentence against him was never carried out. Moreover, she explained that she could not simply relocate elsewhere in Ecuador because indigenous people are unable to move freely.

After hearing these allegations, the asylum officer asked Pomavilla-Zaruma whether she remembered indicating during the border interview that she was not afraid to return to Ecuador. She answered that she "couldn't really understand" the border patrol officer because "[m]ost of it was in English." CAR 29. She also told the asylum officer about her experience entering the United States the day before the border interview, explaining that she was "very scared" because "one officer had hit [her]." CAR 29. The asylum officer then found Pomavilla-Zaruma to have a credible fear of persecution.

In 2018, Pomavilla-Zaruma testified at a hearing before an IJ, with the assistance of an interpreter. Echoing her account during the credible fear

6

interview, she described racism against the indigenous population in Ecuador, the years of repeated sexual abuse by her assaulter, the Ecuadorian authorities' failure to protect her and enforce her assaulter's sentence, and her fear of persecution and torture were she to return to Ecuador. She also shared additional details, including that her assaulter had continued to threaten her mother in Ecuador. She testified that as recently as three months before the IJ hearing, her assaulter warned her mother that he would one day find Pomavilla-Zaruma again.

The government cross-examined Pomavilla-Zaruma about the border interview. First, it asked whether "everything [she] told the officer [was] true and correct," and she answered "yes." CAR 122. Then, the government asked about her statement that she had come to the United States for employment and education, and that she did not fear persecution upon return. She explained, "Well, to be honest with you, that day I was very nervous. I couldn't really understand much, and they were only talking in English." CAR 123. After the IJ expressed skepticism of Pomavilla-Zaruma's explanation, her counsel added that "she is somewhat confused and was confused at the time of the [border] interview." CAR 129.

7

The IJ denied all relief because he found Pomavilla-Zaruma to be incredible on two grounds. First, the responses she gave during the border interview about coming to the United States for employment and education and not fearing persecution were inconsistent with her later account of fleeing to the United States to escape persecution. Second, her testimony that the interview was conducted in English was "simply unbelievable" because the record of the interview stated that it was conducted in Spanish and because border interviews are generally conducted in the interviewee's native language. CAR 87–88.

Pomavilla-Zaruma appealed to the Board of Immigration Appeals (BIA), which affirmed the IJ's credibility decision on similar grounds in 2020. In addition to challenging the adverse credibility finding, Pomavilla-Zaruma claimed for the first time that the border interview record was improperly admitted into evidence at the IJ hearing. The BIA rejected that argument as waived and also rejected it on the merits. Pomavilla-Zaruma timely petitioned this Court for review.

**STANDARD OF REVIEW**

Where, as here, the BIA adopts the IJ's reasoning and supplements its decision, we review the IJ's decision as supplemented by the BIA. *Chen v. Gonzales*,

8

417 F.3d 268, 271 (2d Cir. 2005). "Our review of the IJ's decision includes the portions not explicitly discussed by the BIA." *Hong Fei Gao v. Sessions*, 891 F.3d 67, 76 (2d Cir. 2018) (cleaned up).

We review factual findings, including adverse credibility findings, for substantial evidence, meaning we require "that they be supported by reasonable, substantial and probative evidence in the record when considered as a whole." *Id.* (cleaned up). Although we treat factual findings as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B), we do not "defer to unreasoned rulings, or those based on legal error, faulty analysis, or misreadings of the record," *Gao v. Bd. of Immigr. Appeals*, 482 F.3d 122, 127 (2d Cir. 2007) (quoting *Li Zu Guan v. I.N.S.*, 453 F.3d 129, 136 (2d Cir. 2006)).

## DISCUSSION

### I. Adverse Credibility Finding

In making a credibility finding, an IJ must consider "the totality of the circumstances, and all relevant factors" and may base the determination on, among other things, "consistency between the applicant's or witness's written and

oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made)" and "the consistency of such statements with other evidence of record." 8 U.S.C. § 1158(b)(1)(B)(iii). To that end, when the inconsistencies underlying an adverse credibility finding arise from an applicant's statements in a border interview, the IJ "must closely examine" the border interview to ensure it is sufficiently reliable "to merit consideration." *Ramsameachire*, 357 F.3d at 179. As we observed in *Ramsameachire*, border interviews take place shortly after applicants arrive in the United States, often after significant travel. If an applicant was fleeing persecution in her home country, she may be wary of governmental authorities and perceive questions from border patrol officers as coercive or threatening. The interviewee may also be unrepresented by counsel, unknowledgeable of U.S. asylum law, and unable to understand aspects of the proceedings conducted in English. Moreover, the officer conducting the interview may not endeavor to solicit the information needed to establish an asylum claim or record a verbatim account of the interview. *See id.* at 179–80 (citing *Balasubramanrim*, 143 F.3d at 162–63, and *Senathirajah*, 157 F.3d at 218–20).

10

In *Ramsameachire*, we recognized these limitations and set forth four non-exhaustive factors that "provide the analytical framework for assessing the reliability" of border interviews: A border interview record is "inherently less reliable" if (1) the record "merely summarizes or paraphrases the [noncitizen's] statements" rather than include "a verbatim account or transcript," (2) "the questions asked are not designed to elicit the details of an asylum claim, or the . . . officer fails to ask follow-up questions that would aid the [noncitizen] in developing his or her account," (3) "the [noncitizen] appears to have been reluctant to reveal information to INS officials because of prior interrogation sessions or other coercive experiences in his or her home country," or (4) "the [noncitizen's] answers to the questions posed suggest that the [noncitizen] did not understand English or the translations provided by the interpreter." *Id.* at 180 (cleaned up).

We stated in *Ramsameachire* that "[i]n all cases," "[t]hese aspects of the interview *must be deemed reliable* before the [agency] uses the interview to assess the [applicant's] credibility." *Id.* (emphasis added). However, statements in some of our subsequent cases have left some uncertainty around whether consideration

11

of the *Ramsameachire* factors is actually required of immigration judges or simply best practice.

In *Latifi v. Gonzales*, an IJ found an asylum applicant not credible in reliance on an inconsistency between the applicant's airport interview and later testimony, without considering the applicant's explanation "that he was afraid and pressured, and did not know whether any harm would come to him if he mentioned his political situation." 430 F.3d 103, 105 (2d Cir. 2005). Observing that the applicant's explanation for the inconsistency "falls squarely within the category of reasons which, as we stated in *Ramsameachire*, require that airport interviews be viewed with caution," we held that the IJ's failure to "evaluate this explanation" amounted to error. *Id.* In various nonprecedential decisions, panels of this Court have similarly found reversible error where the agency appeared not to have examined the *Ramsameachire* factors despite their apparent relevance. *See, e.g., Zhen Hui Ye v. U.S. Dep't of Just.*, 159 F. App'x 243, 245 (2d Cir. 2005); *Yu Qiao Wang v. Gonzales*, 190 F. App'x 20, 23 (2d Cir. 2006); *Hui Mei Li v. Bd. of Immigr. Appeals*, 204 F. App'x 985, 987 (2d Cir. 2006).

But in *Yun-Zui Guan v. Gonzales*, we held that where the *Ramsameachire* factors simply are not relevant, it is not "essential [for them] to be assessed," reasoning that "[r]eviewing a factfinder's determination of credibility is ill-suited to attempts to fashion rigid rules of law." 432 F.3d 391, 396 (2d Cir. 2005). *Yun-Zui Guan* distinguished *Latifi*, explaining that when a petitioner has "provided an explanation for the inconsistencies" between a border interview and later testimony that falls "squarely within" the *Ramsameachire* factors, and the IJ "failed to 'evaluate' that explanation," the inconsistencies can "not support the IJ's adverse credibility finding." *Id.* at 399 (quoting *Latifi*, 430 F.3d at 105).

Considering *Ramsameachire*, *Latifi*, and *Yun-Zui Guan* together, we hold that an IJ is required to consider the *Ramsameachire* factors before relying on a border interview for an adverse credibility determination *if* the record indicates the factors may be relevant. Here, the record contains various indications that the *Ramsameachire* factors would be relevant to assessing the reliability of Pomavilla-Zaruma's border interview record.

For example, the second factor is implicated because the border interview questions generally were not "designed to elicit the details of an asylum claim"

13

and the interviewing officer failed "to ask follow-up questions that would aid [Pomavilla-Zaruma] in developing . . . her account." *Ramsameachire*, 357 F.3d at 180 (cleaned up). Pomavilla-Zaruma was asked one question about fear of persecution and torture, but those terms were not defined, and she was not asked about any harm she had experienced in Ecuador. And unlike the applicant in *Ramsameachire*, Pomavilla-Zaruma was not warned that she should be fully forthcoming about any fear or history of persecution lest she lose her chance to obtain asylum. *See id.* at 176. The agency appears not to have considered this factor before finding Pomavilla-Zaruma not credible.

The record also indicates that the third *Ramsameachire* factor may have been implicated—Pomavilla-Zaruma may "have been reluctant to reveal information" because of prior "coercive experiences." *Id.* at 180. Pomavilla-Zaruma explained at the credible fear interview that she was "really frightened" because one of the border patrol officers had hit her and yelled at her when she arrived at the U.S. border. CAR 145. Then, when asked during the IJ hearing about inconsistencies, Pomavilla-Zaruma repeated that she had been "very nervous" during the border interview. CAR 123. Moreover, the governmental authorities whom Pomavilla-

14

Zaruma was accustomed to dealing with in Ecuador were allegedly biased against her and reluctant to help her because of her indigenous status. The agency seemed not to consider that under these combined circumstances, Pomavilla-Zaruma might have been reluctant to share her alleged history of persecution with a border patrol officer.

Because the second and third *Ramsameachire* factors would have been relevant to assessing the reliability of Pomavilla-Zaruma's border interview record, the IJ erred in relying on the border interview without considering these factors. Absent such consideration, the inconsistencies between Pomavilla-Zaruma's statements in her border interview and later testimony cannot provide substantial evidence in support of an adverse credibility finding.

Granted, the agency did not base its adverse credibility finding solely on Pomavilla-Zaruma's inconsistent statements about her reason for coming to the United States and fear of persecution. The agency also relied on a statement Pomavilla-Zaruma made during the IJ hearing implying that the border interview was conducted in English, which contradicted record evidence that it was conducted in Spanish by a translator. On appeal to the BIA, Pomavilla-Zaruma

15

submitted an affidavit clarifying that while the officer conducting the border interview asked her questions through a translator, "[her] attorney and the government officers only spoke in English with each other" and "there was a lot of talking going on that wasn't translated," which was "[w]hat [she] meant" when she stated at the IJ hearing that "they were only talking in English." CAR 50.

We may decline to remand "despite error" when an adverse credibility determination "is otherwise supported by substantial evidence and we can state with confidence that the same decision would be made on remand." *Xiao Ji Chen v. U.S. Dep't of Just.*, 471 F.3d 315, 339 (2d Cir. 2006). But remand is warranted if we have "doubts whether, absent the errors identified . . . the IJ would have reached the same conclusion based upon [its] remaining [reasons]." *Malets v. Garland*, 66 F.4th 49, 56–57 (2d Cir. 2023). In this case, we cannot state with confidence that on remand, the IJ would find Pomavilla-Zaruma not credible solely based on her statement about the language of the border interview. It is difficult to predict how much weight the IJ placed on Pomavilla-Zaruma's inconsistent statements in her border interview and whether, in light of the *Ramsameachire* factors discussed above, the IJ would reach the same adverse

16

credibility conclusion on remand. Therefore, we vacate the agency's adverse credibility determination and remand for further consideration.

## II. Admission of the Border Interview Record

In addition to contesting the agency's adverse credibility finding, Pomavilla-Zaruma's petition for review challenges the admission of the border interview record into evidence. Regardless of the merits of this challenge, it is waived. When the BIA declines to consider an issue because it is waived, "this Court's review is limited to whether the BIA erred in deeming the argument waived." *Prabhudial v. Holder*, 780 F.3d 553, 555–56 (2d Cir. 2015). "[T]he BIA may refuse to consider an issue that could have been, but was not, raised before an IJ," and here, the BIA was correct as a factual matter that neither Pomavilla-Zaruma nor her counsel objected to the border interview record's admission. *Id.* at 555. Therefore, the BIA did not err in deeming Pomavilla-Zaruma's evidentiary argument waived. Moreover, Pomavilla-Zaruma did not address the BIA's waiver finding in her petition to this Court and thereby abandoned any challenge to it. *See Yueqing Zhang v. Gonzales*, 426 F.3d 540, 545 n.7 (2d Cir. 2005). Accordingly,

we deny Pomavilla-Zaruma's petition in part as it pertains to the IJ's admission of the border interview record into evidence.

## CONCLUSION

For the foregoing reasons, Pomavilla-Zaruma's petition for review is GRANTED in part and DENIED in part, the BIA's decision is VACATED, and the case is REMANDED for further consideration consistent with this opinion.