17-2182-ag
Manning v. Barr

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2018

(Argued: June 14, 2019                    Decided: March 31, 2020)

Docket No. 17-2182-ag

_____

KENNETH MANNING, AKA Anthony Manning,
AKA Bud Manning, AKA Kenny Manning,

*Petitioner*,

v.

WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL,

*Respondent*.

_____

Before: POOLER, CHIN, and SULLIVAN, *Circuit Judges*.

Petition for review of a decision by the Board of Immigration Appeals

("BIA"), denying Kenneth Manning's application for deferral of removal under

the Convention Against Torture. We hold that the jurisdictional provision in 8

U.S.C. § 1252(a)(2)(C), which limits this Court's jurisdiction, applies only to cases where the Immigration Judge ("IJ") has found a petitioner removable based on covered criminal activity, and that it does not apply where a petitioner's order of removal is based solely on unlawful presence. We also hold that the IJ and BIA discounted Manning's credible testimony without proper explanation, failed to consider substantial and material evidence that Manning is likely to be killed if removed to Jamaica, and erroneously placed a burden on Manning to prove he could not internally relocate in order to avoid torture. Accordingly, we GRANT the petition for review and REMAND Manning's application for deferral of removal for further proceedings consistent with this opinion.

GRANTED and REMANDED.

Judge Sullivan dissents in a separate opinion.

_____

EDMUND POLUBINSKI III (Daniel S. Magy, *on the brief*), Davis Polk & Wardwell LLP, New York, NY, *for Petitioner Kenneth Manning.*

SCOTT STEWART (Carl McIntyre, Assistant Director, Nancy Friedman, Senior Director, *on the brief*), *for* Joseph H. Hunt, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., *for Respondent William P. Barr, United States Attorney General.*

2

POOLER, *Circuit Judge*:

We hold that the jurisdictional provision in 8 U.S.C. § 1252(a)(2)(C), which limits this Court's jurisdiction, applies only to cases where the Immigration Judge ("IJ") has found a petitioner removable based on covered criminal activity, and that it does not apply where a petitioner's order of removal is based solely on unlawful presence. We also hold that the IJ and the Board of Immigration Appeals ("BIA") discounted Manning's credible testimony without proper explanation, failed to consider substantial and material evidence that he is likely to be killed if removed to Jamaica, and erroneously placed a burden on him to prove he could not internally relocate in order to avoid torture. Accordingly, we GRANT the petition for review and REMAND Manning's application for deferral of removal for further proceedings consistent with this opinion.

**BACKGROUND**

Kenneth Manning came to the United States from Kingston, Jamaica in 1985. Three years later, Manning was arrested by federal authorities in a sweep of arrests of associates of a Jamaican gang known as the Renkers Posse.

Delroy Edwards, who was then the leader of the Renkers Posse, was also apprehended. At the time the United States Attorney for the Eastern District of

3

New York described Edwards as "one of the most feared crack-organization enforcers in America." Certified Record on Appeal ("CAR") at 643. As the leader of the Renkers Posse, Edwards tortured and killed those he believed had wronged him. Edwards was eventually convicted of 42 counts of murder, assault, kidnapping, and drug charges, and he received seven consecutive life sentences. The trial was nationally publicized, covered by news outlets such as the *New York Times* and the Associated Press.

Manning is related to Edwards through a half-sibling and they came from the same neighborhood in Jamaica. The two were "like brothers" growing up—they formed the Renkers Posse together as teenagers. CAR at 527. After Manning's arrest, he agreed to cooperate with the government in its prosecution of Edwards. He provided information about criminal acts not alleged in the indictment and testified at trial. His testimony was, according to the government in its sentencing letter, "critical to virtually the entire case" and the "centerpiece" of Edwards's conviction on four murder charges. CAR at 564. The government explained that it could not "overstate the fullness, completeness, and value of [Manning's] cooperation," and that he "continues to provide important assistance in related cases." *Id.*

Manning pled guilty to second degree murder in New York state court and racketeering charges in federal court. He was ultimately sentenced to 20 years to life imprisonment in New York state court and 15 years in federal court. Manning served 28 years in prison before his release in 2016. Throughout his incarceration, Manning remained in protective custody because of his cooperation in the Edwards trial.

As part of his protective custody, Manning was kept in a separate section from the prison's general population. Special arrangements had to be made when he used common areas such as the cafeteria, the medical unit, and the library. Manning identified himself to other inmates by his initials, and his visitors had to first be vetted by an office in Washington D.C. Every six months for 28 years in two different federal prisons, the government reviewed Manning's protective custody status and affirmed his placement each time.

When Manning was granted parole in August 2016, the Department of Homeland Security served him with a Notice to Appear and charged him as removable for being "present in the United States without being admitted or paroled." CAR at 942. The IJ determined that Manning was removable as charged and designated Jamaica as the country of removal. Manning filed an

application for deferral of removal under the Convention Against Torture ("CAT") on the ground that, if removed to Jamaica, he would be killed in retaliation for his earlier cooperation.

Manning submitted testimony and documentary evidence in support of his application, and the IJ held a hearing. The IJ determined that the testimony was credible but concluded that Manning was no longer in danger, reasoning that Manning had not established that anyone in Jamaica "intend[ed] to torture him because he testified against a different gang member some 20 years ago" and that he had "not established that he could not relocate to another part of Jamaica . . . where he could live without being identified." CAR at 68. After Manning appealed, the BIA affirmed the denial, adopting the IJ's conclusions on the basis that Manning had "not established that the [IJ's] determination on the likelihood of torture was clearly erroneous." CAR at 4. The BIA found "no clear error in the manner in which the [IJ] weighed the evidence of record." CAR at 4.

Manning next petitioned this Court for review of the BIA's order and also moved for a stay of removal, to proceed in forma pauperis, and for assignment of pro bono counsel. The government filed a motion to dismiss the appeal for lack of jurisdiction. This Court granted Manning's motions and instructed counsel "to

6

brief, in addition to the merits of the CAT claim and any other issues, whether this Court's jurisdiction is limited by 8 U.S.C. § 1252(a)(2)(C) even though Petitioner was not ordered removed on the basis of his criminal conviction." Dkt. No. 42 at 1.

## DISCUSSION

### I.    Jurisdiction

The government argues that this Court lacks jurisdiction to review Manning's petition pursuant to 8 U.S.C. § 1252(a)(2)(C), known as the "criminal alien bar," which provides a limited exception to Section 1252(a)(1)'s general grant of jurisdiction over final orders of removal under 8 U.S.C. § 1252(a)(1).

Manning argues that this Court retains jurisdiction for three reasons: (1) Section 1252(a)(2)(C) does not bar jurisdiction because Manning was not removed on the basis of his criminal convictions; (2) despite this Court's precedent to the contrary, Section 1252(a)(2)(C) does not apply to petitions challenging denials of applications for deferral of removal; and (3) even if Section 1252(a)(2)(C) does apply to limit jurisdiction, this Court should consider Manning's appeal because this Court retains jurisdiction over questions of law under Section 1252(a)(2)(D). We agree with Manning's first argument. We hold

that Section 1252(a)(2)(C) does not bar this Court's jurisdiction where a petitioner's order of removal is based solely on unlawful presence, even if the petitioner could have been—but was not—ordered removed based on a covered criminal offense.[1]

In interpreting the terms of a statute, "our analysis begins with the text" of Section 1252(a)(2)(C), "and we look to both the language itself and the specific context in which that language is used." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (internal quotation marks and brackets omitted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Otherwise, "words will be interpreted as taking their ordinary, contemporary, common meaning." *Arriaga v. Mukasey*, 521 F.3d 219, 225 (2d Cir. 2008) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

The statutory language at issue states that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in [certain sections of the statute]." 8 U.S.C. § 1252(a)(2)(C). The government argues that the phrase "is removable by reason of having committed a criminal offense" captures criminal

---

[1] Accordingly, we do not address Manning's second or third arguments.

8

conduct beyond that which was used as basis of the final order of removal. Because Manning does not challenge that he is an aggravated felon, the government argues, 8 U.S.C. § 1252(a)(2)(C) prevents judicial review of the petition because he was theoretically removable based on that conviction.

We disagree. A fair reading of "is removable," when juxtaposed with the first part of the provision, makes clear that it refers back to the "final order or removal" mentioned earlier. The two phrases are not, as the government suggests, separate and unrelated requirements. Put another way, if an order is "final" then the person must have been ordered removed for some reason. And if that person is removable "by reason of having committed a criminal offense" then the order must have been predicated on the person having committed one of the covered criminal offenses. To conclude otherwise—that "removable by reason of having committed a criminal offense" means that a person merely *could have been* found removable based on a covered offense no matter what the basis of the IJ's determination in the final order of removal—unmoors the second part of the provision from the first part and belies the plain text when both are read together.

An examination of "the broader statutory structure," *Merit Mgmt.*, 138 S. Ct. at 893, confirms this interpretation. Under the Immigration and Nationality Act ("INA"), a person can only be charged removable based on one of the covered criminal offenses if the IJ explicitly determines so. The INA provides that the IJ's proceedings are the "sole and exclusive procedure for determining whether an alien may be . . . removed," 8 U.S.C. § 1229a(a)(1); that, when such proceedings conclude, the IJ "shall decide whether an alien is removable," *id.* § 1229a(c)(1)(A); and that the IJ's determination regarding removability "shall be based only on the evidence produced at the hearing," *id.* The fact that the removability determination inheres in the IJ lends further support to the interpretation that the IJ must have actually predicated the order of removal on a covered criminal offense.

We join the majority of the other circuits that have considered the issue and hold that the jurisdictional provision in Section 1252(a)(2)(C) is limited to cases where the IJ has charged a petitioner removable based on covered criminal activity. *See Mena-Flores v. Holder*, 776 F.3d 1152, 1157-60 (10th Cir. 2015); *McAllister v. Att'y Gen.*, 444 F.3d 178, 184 (3d Cir. 2006); *Alvarez-Santos v. INS*, 332 F.3d 1245, 1253 (9th Cir. 2003); *Lemus-Rodriguez v. Ashcroft*, 350 F.3d 652, 654 (7th

Cir. 2003); *accord Yousefi v. INS*, 260 F.3d 318, 324–25 (4th Cir. 2001) (interpreting similar language in predecessor statute); *Choeum v. INS*, 129 F.3d 29, 40 (1st Cir. 1997) (same).[2]

Our conclusion is also consistent with this Circuit's precedent. *See Flores v. Holder*, 779 F.3d 159, 163 n.1 (2d Cir. 2015) (rejecting government's assertion of lack of jurisdiction pursuant to Section 1252(a)(2)(C) because (1) petitioner "was not, however, found removable for having committed an aggravated felony," and (2) in any event, "we retain jurisdiction to review constitutional claims and questions of law"(internal quotation marks)); *see also Ortiz-Franco v. Holder*, 782 F.3d 81, 90-91 (2d Cir. 2015) ("[T]he applicability of § 1252(a)(2)(C) is a straightforward inquiry: Was the alien charged with removability because of a relevant crime, and did the IJ correctly sustain that charge?"(internal quotation marks omitted)). Contrary to the government's argument, our decision in *Qui Guan Di Zhang v. INS*, 274 F.3d 103 (2d Cir. 2001), does not require a different

---

[2] The two circuits that have concluded otherwise both faced circumstances where the order of removal was initially predicated on a covered criminal offense. *See Fernandez-Bernal v. Att'y Gen.*, 257 F.3d 1304, 1310 (11th Cir. 2001) (holding that Section 1252(a)(2)(C) applied when petitioner was ordered removed on basis of controlled-substance conviction that was later expunged); *Lopez-Elias v. Reno*, 209 F.3d 788, 793 (5th Cir. 2000) (holding that basis for petitioner's removal, burglary, constituted a "crime of violence" for purposes of Section 1252(a)(2)(C)).

interpretation of Section 1252(a)(2)(C). *Zhang* considered the scope of covered crimes that are subject to the jurisdictional limitation in Section 1252(a)(2)(C). 274 F.3d at 108. It did not address whether "is removable by reason of" means *actually* found removable by reason of a covered criminal offense or *could have been* found removable by reason of a covered criminal offense.

Likewise, our interpretation comports with a) due process, which affords a petitioner the right to notice and a fair opportunity to be heard—before the case reaches the Court of Appeals, *see Ali v. Reno*, 22 F.3d 442, 448 (2d Cir. 1994); b) the "strong presumption of judicial review of administrative action[s]," *INS v. St. Cyr*, 533 U.S. 289, 298 (2001); and c) the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987).

Here, as the motions panel already noted, Manning was "not ordered removed on the basis of his criminal conviction." Dkt. No. 42 at 1; *see also* CAR at 942 (Notice to Appear charging Manning only with being "present in the United States without being admitted or paroled"). As such, Section 1252(a)(2)(C) does not limit this Court's jurisdiction over Manning's petition.

## II. Manning's CAT Claim

Where the "BIA adopt[s] and affirm[s] the IJ's decision, we review the two decisions in tandem." *Ruqiang Yu v. Holder*, 693 F.3d 294, 297 (2d Cir. 2012). In doing so, we review questions of law de novo, *Harbin v. Sessions*, 860 F.3d 58, 63 (2d Cir. 2017), and factual findings under the substantial evidence standard, *Kone v. Holder*, 596 F.3d 141, 146 (2d Cir. 2010). The substantial evidence standard requires that factual findings "be supported by reasonable, substantial and probative evidence in the record when considered as a whole." *Kone*, 596 F.3d at 146 (internal quotation marks omitted). It requires "a certain minimum level of analysis from the IJ and BIA, as well as some indication that the IJ considered material evidence supporting a petitioner's claim." *Castro v. Holder*, 597 F.3d 93, 100 (2d Cir. 2010) (internal quotation marks omitted). This Court will "vacate and remand for new findings . . . if the agency's reasoning or its factfinding process was sufficiently flawed." *Xiao Kui Lin v. Muaksey*, 553 F.3d 217, 220 (2d Cir. 2009).

The CAT prohibits the government from removing Manning to any country where it is "more likely than not that he . . . would be tortured." 8 C.F.R. § 1208.16(c)(2). "[T]o prevail on a CAT claim the alien need only proffer objective evidence that he or she is likely to be tortured in the future." *Ramsameachire v.*

13

*Ashcroft*, 357 F.3d 169, 185 (2d Cir. 2004). "The burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Torture is "the intentional infliction of pain or suffering that is perpetrated or sanctioned by a nation's authorities." *Ramsameachire*, 357 F.3d at 184. Because the BIA declined to reach the IJ's decision regarding government acquiescence, it is not before this Court. *See Passi v. Mukasey*, 535 F.3d 98, 100 (2d Cir. 2008). We review the BIA's determination that Manning is not eligible for deferral of removal under the CAT on the sole ground that he "has not established that the Immigration Judge's determination on the likelihood of torture was clearly erroneous." CAR at 4.

Manning argues that the BIA's denial of Manning's CAT claim was legally erroneous and not supported by substantial evidence for three reasons: (1) the IJ and BIA discounted Manning's credible testimony without proper explanation; (2) the IJ and BIA ignored substantial and material evidence that Manning is likely to be killed if removed to Jamaica; and (3) the IJ and BIA erred in requiring Manning to prove that he could not relocate to another part of Jamaica in order to establish his CAT claim. We agree as to each and address each argument in turn.

**A. Credible Testimony**

In making a credibility determination, the IJ is to "[c]onsider[] the totality of the circumstances, and all relevant factors." 8 U.S.C. § 1229a(c)(4)(C). If the IJ determines that a petitioner's testimony is credible but nonetheless insufficient to meet his burden of proof, the IJ must "explain specifically, either in its decision or otherwise in the record: (1) why it is reasonable under the BIA's standards to expect such corroboration; and (2) why [petitioner's] proffered explanations for the lack of such corroboration are insufficient." *Diallo v. INS*, 232 F.3d 279, 290 (2d Cir. 2000).[3]

We have before vacated and remanded where, for example, "the IJ identified no inconsistencies in the [petitioner's] testimony and made no adverse credibility finding, [but] apparently dismissed significant portions of the [petitioner's] testimony as uncorroborated, without discussing whether such corroboration would have been obviously material and reasonably available." *Poradisova v. Gonzales*, 420 F.3d 70, 79 (2d Cir. 2005) (citing *Diallo*, 232 F.3d at 287-89). We have similarly done so where the IJ identified specific documents needed

---

[3] Although *Diallo* precedes the REAL ID Act, we have previously noted that "[t]he corroboration standard under the REAL ID Act [of 2005] closely tracks our pre-REAL ID Act case law." *Wei Sun v. Sessions*, 883 F.3d 23, 28 (2d Cir. 2018) (citing *Diallo*, 232 F.3d at 285-86).

to corroborate a petitioner's testimony but "failed to explain why additional documentation was crucial." *Bangoura v. Bd. of Immigration Appeals*, 235 F. App'x 804, 806 (2d Cir. 2007) (citing *Diallo*, 232 F.3d at 288).

Here, the IJ determined that Manning was credible: "I do find in this case that [Manning] has been a credible witness, so credibility is not at issue. [Manning] has testified candidly and consistently with his earlier submissions and I have no reason at this point to doubt his credibility." CAR at 62. Manning's credible testimony included that he broke the code of silence in Jamaica, which is punishable by death; that it is common knowledge that he informed on dangerous criminals; that he "is getting out [of prison] soon," CAR at 167, so that it would become common knowledge if he were to return to Jamaica because he and Edwards share familial and social connections; and that he received death threats during his incarceration warning him that he would be killed if he returned to Jamaica.

Yet the IJ concluded that "although [Manning] has testified credibl[y] . . . I do not find he has met his burden of proof that it is more likely than not that he would suffer torture" if removed to Jamaica. CAR at 67.

16

We hold that the IJ committed reversible error in discounting Manning's credible testimony without explaining why further corroboration would be necessary or whether such corroboration would have been obviously material and reasonably available. After all, Manning's testimony was corroborated by the affidavit of Dr. Anthony Harriott, an expert on Jamaican organized crime. Dr. Harriott's affidavit, which the IJ had before it, contradicted the IJ's finding. Dr. Harriott concluded that "[d]espite his long stay in prison in the USA and a possible waning of the influence of Delroy Edwards, were Mr. Manning to be returned to Jamaica, his life would be put at risk." CAR at 540. He noted that the death threats Manning received "were delivered in anticipation of his removal from the USA to Jamaica [and] [s]uch threats are consistent with the institutionalization of the code of silence." CAR at 539. He further stated: "given that Mr. Manning collaborated with the US authorities and that his collaboration contributed to the conviction of Delroy Edwards, were Mr. Manning to be removed to Jamaica, his life would be at risk." CAR at 538.

In finding that Manning's credible testimony (and also Dr. Harriott's corroborating affidavit) was insufficient, the IJ determined—and the BIA agreed—that Manning's "fear concerning future torture appears to be

17

generalized and unsupported, and relies on a series of suppositions that are simply too speculative." CAR at 4. But this assertion fails to "explain specifically, either in its decision or otherwise in the record: (1) why it is reasonable under the BIA's standards to expect [additional] corroboration [of Manning's credible testimony]; and (2) why [Manning's] proffered explanations for the lack of such corroboration are insufficient." *Diallo*, 232 F.3d at 290. The IJ found that Manning's testimony was credible and consistent. Manning testified that he faced near-certain lethal reprisal in Jamaica despite the passage of time, and an expert on Jamaican gang violence provided support and context for that contention. The IJ erred as a matter of law by failing to identify what additional corroborating evidence was needed or to explain why it was reasonable to expect additional corroboration.

**B. Consideration of Evidence**

The IJ and BIA also ignored substantial and material evidence that Manning is likely to be killed if removed to Jamaica. "In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered. . . ." 8 C.F.R. § 1208.16(c)(3). While the IJ or BIA need not "expressly

18

parse or refute on the record each individual . . . piece of evidence," it "should demonstrate that it has considered [material] evidence, even if only to dismiss it." *Wang v. B.I.A.*, 437 F.3d 270, 275 (2d Cir. 2006) (internal quotation marks omitted). "Where the immigration court fails to consider important evidence supporting a petitioner's claim, we are deprived of the ability adequately to review the claim and must vacate the decision and remand for further proceedings." *Id.* at 275 (internal quotation marks omitted).

From the outset, we find error in the IJ's and BIA's failure to consider the unrebutted expert affidavit of Dr. Harriott, which we assume to be credible. *See Chen*, 417 F.3d at 272. As discussed in Section II.A, supra, Dr. Harriott concluded that Manning's life was still at risk if he were removed to Jamaica. And "it is not sufficient simply to ignore" Dr. Harriott's affidavit "when announcing a conclusion" regarding likelihood of torture. *Chen*, 417 F.3d at 272.[4] Instead, the IJ

---

[4] The IJ failed to mention Dr. Harriott's expert affidavit when concluding that Manning had failed to establish it was more likely than not that he would be tortured if removed to Jamaica. Although government acquiescence is not before us, we note that the IJ did mention Dr. Harriott's affidavit in that portion of the opinion. The IJ cited Dr. Harriott's affidavit as support for its conclusion that "[a]lthough [Jamaica] still has a long way to go, it does appear that the Jamaican government are not acquiescing or turning a blind eye." CAR at 94. But Dr. Harriott's affidavit posits a contrary conclusion, stating that today the country has a "generally tolerant attitude to the use of violence against criminal suspects"

19

asserted that Manning "has failed to establish that it is more likely than not that any of those people currently in those [other] gangs would intend to torture him because he testified against a different gang member some 20 years ago." CAR at 68. Dr. Harriott explained, however, that the code of silence, also known as "informi fi dead," is "strict[ly] enforce[d]"and gang members "are expected to remain loyal to the group and not collaborate with the police." CAR at 539. If not, Dr. Harriott said, "[v]iolations result in near certain and swift death." *Id.* Finally, Dr. Harriott said that even today "[t]he Southside gangs to which Edwards was affiliated are active in Jamaica and are very capable groups." CAR at 540.

The IJ and BIA further erred in failing to consider significant and material evidence of the death threats Manning received. He stated in a declaration submitted to the IJ that everyone in his family in Jamaica knew he informed on the gang, and that his family members were afraid to attend his immigration proceedings out of fear that they would be perceived as associating with him. According to Manning, Edwards's family, too, made clear that the threat persisted—including one family member saying that if Manning returns to

and "the Jamaican police are unlikely to offer any meaningful protection to someone like Mr. Manning who was convicted of serious crimes." CAR at 540.

20

Jamaica, he is "going to die." CAR at 160-62. Markedly, Manning also said that the mother of his children had relayed to him that Edwards's "family and other people would say 'when Kenneth back in Jamaica, we gonna kill him.'" CAR at 531. Manning's nephew also submitted a declaration, which the IJ did not acknowledge, stating:

> My mother is considered like an outcast in her family because Kenneth informed.
> . . .
> [Edwards] used to be the one who gave [the community members] money. They look at him as a big shot and he was taking care of them down there even when he was in the United States. They blame Kenneth for the loss of that support.
>
> Delroy has two siblings in Jamaica . . . . He also has many children.
> . . .
> People don't forgive in Jamaica. I believe that if my uncle Kenneth is deported to Jamaica, I wouldn't give it a month before he is murdered. . . .
>
> I believe that if he is deported, [Edwards's] siblings will learn that Kenneth is out and then someone will kill him. The attitude is, we are going to teach him how to keep his mouth shut. People in the posses down there know Kenneth and [Edwards].

CAR at 543-44.

For his part, Edwards, while incarcerated, published a blog in 2015 that specifically mentioned Manning's cooperation with the government, and called those that testified against him "rats." CAR at 600. He wrote that the cooperators

21

"[s]hould have taken their own lives rather than face dishonor" by informing. *Id.* ("I grew up internalizing the thought that you never, ever rat on people; and in a Jamaica run on the ancient warrior code 'death before dishonor.' 'Informa Fi dead' was a phrase inculcated in the mind of every ghetto kid. However none [of the cooperators] honored those codes.").

This evidence is material to the possibility of Manning's future torture. There was no evidence before the IJ or BIA that placed a time limit on the danger. In fact, as noted above, the government reviewed Manning's protective custody status every six months for 28 years and affirmed his placement each time. Because the IJ and BIA erred in overlooking material evidence, we must vacate and remand.

**C. Internal Relocation**

"In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including . . . [e]vidence that the

22

applicant could relocate to a part of the country of removal where he or she is not likely to be tortured." 8 C.F.R. § 1208.16(c)(3)(ii).

The governing regulations, to be sure, do not require an applicant to prove that it is not possible to relocate to a different area of the country in order to evade torture. The IJ erred as a matter of law in placing such a burden on Manning. *See* CAR at 68 (stating that Manning's claim failed in part because he "has not established that he could not relocate to another part of Jamaica . . . where he could live without being identified"). The government argues, without citing to any regulation or precedent from this Circuit, that "[a] CAT applicant always has the burden to establish that internal relocation is not possible." Gov't Br. at 27. We disagree. That the IJ shall consider "[e]vidence that the applicant could relocate" does not mean there is a burden on the applicant to establish relocation is not possible. 8 C.F.R. § 1208.16(c)(3)(ii). Rather, evidence that an applicant can relocate to another part of the country where he or she is "not likely to be tortured" is only one of a number of factors an agency is to consider. *See* 8 C.F.R. § 1208.16(c)(3).

Even more problematic is the IJ's supposition that Manning could avoid torture in Jamaica by simply cutting off all contact with his family and friends:

23

"[T]here is no reason why he could not go back to Jamaica and relocate to another part without contacting his family or placing anyone on notice he is back." CAR at 68. We have never before held that internal relocation is satisfied by assuming that a petitioner must essentially live incommunicado and isolated from loved ones. And we decline to do so here. *Cf. Nuru v. Gonzales*, 404 F.3d 1207, 1219 (9th Cir. 2005) ("[I]t will rarely be safe to remove a potential torture victim on the assumption that torture will be averted simply by locating him to another part of the country.").

## CONCLUSION

For the foregoing reasons, Manning's petition for review is thus GRANTED and his application for deferral of removal under the CAT is REMANDED for further proceedings consistent with this opinion.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting

Unlike the majority, I find that the plain text of the criminal alien bar, 8 U.S.C. § 1252(a)(2)(C), strips this Court of jurisdiction to review Manning's petition. The criminal alien bar states, in pertinent part:

> [N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a [covered] criminal offense
> . . . .

8 U.S.C. § 1252(a)(2)(C). The majority interprets this provision to apply only to aliens who have been ordered removed *on the basis of* a covered criminal offense. In a nutshell, then, the majority reads the phrase "is removable by reason of" to mean "has been ordered removed by reason of."

But the criminal alien bar supplies no support for this interpretation of its text. Likewise, the broader statutory scheme counsels against such a reading. And even if this Court did have jurisdiction, I would deny Manning's petition to defer his removal under the Convention Against Torture ("CAT") on the merits. Accordingly, I respectfully dissent.

I.

The criminal alien bar strips this Court of jurisdiction to review final removal orders against "an[y] alien who is removable by reason of having committed" a covered criminal offense. 8 U.S.C. § 1252(a)(2)(C). Reduced to its plain meaning, this provision states that courts may not review the removal order of any alien who has been convicted of certain crimes. *See Zhang v. I.N.S.*, 274 F.3d 103, 108 (2d Cir. 2001) ("[Section] 1252(a)(2)(C) simply states that certain aliens who are removable have no right to direct review; and it identifies them as the aliens who have committed a criminal offense of the class set forth in § 1227(a)(2)(A)(iii)."); *see also Bell v. Reno*, 218 F.3d 86, 89 (2d Cir. 2000). Thus, the relevant text of the criminal alien bar applies "based on the category of 'alien' whose final order of removal is the subject of appeal, not the reason the 'order' issue[d]." *Ortiz-Franco v. Holder*, 782 F.3d 81, 92 n.1 (2d Cir. 2015) (Lohier, J., concurring). Accordingly, the criminal alien bar applies whenever an alien is *removable* by reason of having committed a criminal offense covered by § 1227, not merely when the order of removal is issued on that basis. Other circuits have reached this same conclusion. *See Fernandez-Bernal v. Att'y Gen. of U.S.*, 257 F.3d 1304, 1310 (11th Cir. 2001) (finding that the petitioner "'[wa]s removable' within

the meaning of § 1252(a)(2)(C) because at his hearing before the immigration judge and at oral argument before [the Eleventh Circuit], he admitted, through his counsel, to committing the offense of possession of cocaine"; "so long as [the petitioner] is in fact removable under § 1182(a)(2), we lack jurisdiction to review his final order of removal."); *Lopez-Elias v. Reno*, 209 F.3d 788, 793 (5th Cir. 2000) ("What the INS originally charged is of no consequence; so long as the alien in fact is removable for committing an aggravated felony, this court has no jurisdiction, irrespective of whether the INS originally sought removal for that reason."); *see also Ortiz-Franco*, 782 F.3d at 91-92, 92 n.1 (Lohier, J., concurring) ("'[B]y reason of' modifies 'alien,' not 'order.'").

The plain meaning of the provision's language is consistent with the statutory purpose of § 1252. "[I]t is beyond cavil that one of Congress's principal goals in enacting [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996] was to expedite the removal of aliens who have been convicted of aggravated felonies." *Zhang*, 274 F.3d at 108. Limiting the judicial review available to that class of aliens clearly furthers that aim. Unsurprisingly, then, this reading sits comfortably with the statute's legislative history. *See Ortiz-Franco*, 782 F.3d at 92 n.1 (Lohier, J., concurring) ("[N]othing in the legislative history supports

the . . . view that § 1252(a)(2)(C)'s jurisdictional bar applies only to orders that determine an alien is removable by virtue of having committed a qualifying crime."); *see also* H.R. Rep. No. 109-72, at 174 (2005) (Conf. Rep.), *reprinted in* 2005 U.S.C.C.A.N. 240, 299 ("[U]nder this section, criminal aliens will have fewer opportunities to delay their removal . . . .").

The majority argues that this reading "unmoors the second part of the provision from the first part and belies the plain text when both are read together" – *i.e.*, it separates the criminal conviction from the final removal order. But that is problematic only if one starts from the majority's conclusion and works backwards. The majority's concern for "unmoor[ing]" portions of the text makes sense only if those provisions were intended to be moored together in the first place. But, as discussed above, nothing in the text of the criminal alien bar supports that proposition. Indeed, had Congress intended to join those two provisions, it easily could have written the statute to do so – *e.g.*, "[N]o court shall have jurisdiction to review any final order of removal against an alien *who has been ordered removed* by reason of having committed a criminal offense . . . ."

The majority's interpretation is further belied when placed within the broader statutory scheme. As used throughout the statute, the terms "removable"

4

and "removed" have distinct meanings. The former refers to aliens that *can be* deported, while the latter refers to only those aliens that are *actually* deported (or ordered to be deported). *See, e.g.*, 8 U.S.C. §§ 1227(a), 1229a(e)(2). Accordingly, while every alien that is "removed" must be "removable," the reverse is not necessarily the case. The majority ignores this distinction by reading the phrase "an alien who is removable" to refer to only the subset of removable aliens who are actually ordered removed. This runs afoul of the "presumption that a given term is used to mean the same thing throughout a statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

Moreover, while it is true that determinations of whether an alien is "removable" are generally left to the Immigration Judge ("IJ") under 8 U.S.C. § 1229a(a)(1) and (c)(1)(A), that does not limit courts' ability to assess whether they possess jurisdiction under § 1252(a)(2)(C). Indeed, it is well-understood that this Court retains the ability "to determine underlying jurisdictional facts such as whether there was a conviction and whether the offense of conviction was an aggravated felony." *Zhang*, 274 F.3d at 108; *see also Ming Lam Sui v. I.N.S.*, 250 F.3d 105, 110 (2d Cir. 2001) ("[T]his court retains jurisdiction to review the underlying jurisdictional fact at issue—namely, whether Sui has been convicted of an

aggravated felony."); *Kuhali v. Reno*, 266 F.3d 93, 100–01 (2d Cir.2001) ("[T]o say that a court possesses the authority to ascertain its jurisdiction over a matter is not tantamount to saying that the legislature has designated the court as a forum for resolution on the merits of those issues that happen to underlie the jurisdictional inquiry."); *Bell*, 218 F.3d at 89–90. Thus, this Court may assess whether, on the record created below, a petitioning alien has been convicted of a covered criminal offense.

Here, there is no question that Manning is removable by reason of having been convicted of an aggravated felony – he admits as much.[1] The criminal alien bar therefore plainly applies to Manning's removal order. And while a limited exception to this bar exists for "certain legal claims," 8 U.S.C. § 1252(a)(2)(D), Manning's only colorable challenge is to the IJ's factual determinations concerning the likelihood of his torture upon return to Jamaica.[2] Accordingly, I believe that this Court lacks jurisdiction to review Manning's petition.

---

[1] There is therefore no risk that the Court must engage in a far-ranging fact-finding expedition in conflict with the statute's mandate that the IJ act as sole factfinder.

[2] The Supreme Court recently held that under the § 1252(a)(2)(D) exception, courts have jurisdiction to consider mixed questions of law and fact, including "the application of a legal standard to established facts." *Guerrero-Lasprilla v. Barr*, No. 18–776, slip op. at 11 (Mar. 23, 2020). In a letter filed pursuant to Federal Rule of Appellate Procedure 28(j), Manning argues that his claim falls within this exception. Doc. No. 123. That is simply fanciful. Manning's primary argument is that the IJ improperly disregarded both his credible testimony and other

But even if this Court had jurisdiction, I would deny Manning's petition on the merits.

Manning relies on a chain of suppositions to argue that he is "more likely than not . . . [to] be tortured if removed" to Jamaica.  8 C.F.R. §§ 1208.16(c)(2), 1208.17(a).  In short, Manning posits that even though he last set foot in Jamaica three decades ago, people in Jamaica will:  (i) know who he is; (ii) know and remember that he cooperated with New York prosecutors 20 years ago; (iii) want to do him harm; and (iv) know where and how to find him once he returns.  On top of all that, Manning argues that Jamaican police are corrupt and will permit him to be killed.  Because Manning carries the burden of proof to defer his deportation under CAT, he must demonstrate not only that each individual link in that chain is more likely than not to occur, but that the "entire chain will come

---

material corroborating evidence.  But, as discussed below, the IJ appropriately considered – and rejected – the evidence Manning put forward because it was insufficient to meet Manning's heavy burden.  The weighing of evidence to reach a factual conclusion is the meat and potatoes of fact finding, and does not fall within the reach of § 1252(a)(2)(D).  To be sure, Manning does identify what, if true, would be a legal error:  that the IJ misapplied the law concerning Manning's ability to relocate upon his return to Jamaica to avoid torture.  But this claim is "so insubstantial and frivolous as to be inadequate to invoke federal-question jurisdiction."  *Barco-Sandoval v. Gonzales*, 516 F.3d 35, 40 (2d Cir. 2008).  Accordingly, Manning raises no "colorable" legal issues for our consideration and his petition does not fall within the § 1252(a)(2)(D) exception to the criminal alien bar.  *See id.*

together to result in the probability of [his] torture." *In re J-F-F-*, 23 I. & N. Dec. 912, 917–18, 918 n.4 (A.G. 2006); *see also Savchuck v. Mukasey*, 518 F.3d 119, 123 (2d Cir. 2008) (same).

When considered as a whole, the record amply supports the IJ's rejection of Manning's application. First, much of Manning's evidence is far too general to be accorded great weight. For instance, though Manning states that he is certain that he will be killed for cooperating with prosecutors against members of the Renkers Posse, he admits that he "never really s[ought] [out] any information about the posse" since his placement in protective custody. CAR 193–94. In addition, Manning notes that he served his prison sentence in protective custody. But a finding that Manning would be in danger if he were to be placed in the general prison population in New York does not equate to a finding that his life would be in danger in Jamaica. Indeed, it is not uncommon for cooperating witnesses to be placed in protective custody while they are in prison, given the general antipathy for cooperators among inmates. Lastly, Manning points to a blog post written by Delroy Edwards as proof that he is likely to face torture or death upon his return to Jamaica. But the blog post doesn't say anything about Manning (other than listing him among the other codefendants) and merely refers to all of Edwards's

8

codefendants collectively. Significantly, the blog post does not contain any overt threats towards those codefendants.

Second, much of Manning's evidence is so dated as to no longer reliably describe the present circumstances in Jamaica. For instance, while Manning relies on statements from the mother of his children that he is in danger, the two have not spoken in many years (and she has since died). Likewise, Manning relies on a declaration from his nephew, who was last in Jamaica over a decade ago.

Third, the five-page declaration provided by Manning's expert witness, Dr. Anthony Harriott, is both highly general and at best ambiguous beyond its conclusory assertion that Manning would be at risk if he were to return to Jamaica. On the one hand, Dr. Harriott concludes that gangs are still quite active in Jamaica and that the police tolerate crime directed at criminals. On the other hand, he states that "torture is illegal" in Jamaica and that the police and army have recently undertaken a series of anti-gang campaigns. CAR 538, 540. Moreover, while Dr. Harriott states that many "Southside gangs" are still active in Jamaica, he does not indicate that the Renkers Posse is one of those gangs, nor does he describe the existence of a relationship between the Renkers Posse and the active gangs that

9

would suggest that active gang members would have any reason to harm Manning. CAR 539-40.

Fourth, Manning's ability to relocate in Jamaica is a relevant factor that the IJ was permitted to consider when engaging in the CAT analysis. 8 C.F.R. § 1208.16(c)(3)(ii); *see also Dan-Xia Cao v. Gonzales*, 214 F. App'x 20, 22 (2d Cir. 2007) ("As for CAT relief, an applicant's ability to relocate in her country of removal to avoid torture is just one of many factors an adjudicator should consider in the CAT eligibility analysis."). As the IJ found, there is simply no evidence that Manning would be unable to lead a peaceful life if he were to return to Jamaica somewhere other than Kingston. Indeed, even Manning's own expert witness admitted that the gang violence Manning fears is "concentrated in the urban parishes of Kingston and St. Andrew (both of which constitute the city of Kingston) and the other largely urban parishes." CAR 538. Moreover, the IJ did not, as Manning suggests, "requir[e] Mr. Manning to prove that he could not relocate internally to another part of Jamaica to establish his CAT claim." Pet. Br. at 47. Rather, the IJ appropriately considered Manning's ability to relocate as only one of myriad factors that supported its rejection of Manning's petition. *Maldonado v. Lynch*, on which Manning relies, is not to the contrary. *See* 786 F.3d 1155, 1164 (9th Cir. 2015)

(en banc) ("Section 1208.16(c)(2) does not place a burden on an applicant to demonstrate that relocation within the proposed country of removal is impossible because *the IJ must consider all relevant evidence; no one factor is determinative*." (emphasis added)).

At bottom, Manning bore the burden of showing that his removal would "more likely than not" result in his torture. 8 C.F.R. §§ 1208.16(c)(2), 1208.17(a). To do so, he adduced evidence that was too general, conclusory, or dated to be of much persuasive value. As a result, the IJ concluded that Manning failed to meet his burden. I agree.

*                    *                    *

Accordingly, because this Court lacks jurisdiction to review Manning's removal, and because, even on the merits, Manning has failed to demonstrate that he is more likely than not to be tortured if he returns to Jamaica, I would deny the petition.